## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| HENDERSON STATE BANK, Plaintiff, | ) | Case No. 20 - _____ |
|  | ) |  |
| vs. | ) |  |
|  | ) | **COMPLAINT** |
| RONALD THROGMARTIN, Defendant. | ) |  |
| _____ | ) |  |

COMES NOW Plaintiff and for its causes of actions against Defendant states:

### Introduction

1.      This matter seeks to redress the injury suffered by Plaintiff Henderson State Bank ("**Henderson**") as a direct result of fraudulent and racketeering activity perpetrated by one or more enterprises composed of Mark Ray and certain of his business entities and associates, including Defendant Ron Throgmartin (collectively, and as described more fully below, the "**Enterprise**").  The Enterprise engaged in a number of business activities, some of which are or at one time were legitimate, including a cattle trading operation throughout the Midwest and a marijuana dispensary in Colorado.

2.      Beginning no later than 2017, however, the Enterprise also engaged in multiple fraudulent schemes.  These included a "check kiting" scheme eventually responsible for defrauding Henderson out of more than a million dollars in compensatory damages exclusive of costs and attorney's fees.  The Enterprise used certain third parties to facilitate this scheme, including Nathan Kolterman ("**Kolterman**"), who, with his wife, had a checking account at Henderson.  Ray and others, including but not limited to Throgmartin, convinced third parties to use their own bank accounts to transmit large amounts to and from Enterprise business entities or proprietors on the premise that doing so was in furtherance of legitimate cattle brokering activity.  In fact, many of these

transmissions were made by, to or for the benefit of the Enterprise, enabling it to disguise its true financial condition and obtain cash from financial institutions or individuals like Henderson that the Enterprise tricked into honoring large withdrawal requests from overdrawn accounts. In doing so, the Enterprise repeatedly committed wire and bank fraud and, on information and belief, committed mail fraud. Throgmartin personally engaged in numerous overt acts in furtherance of this scheme, including acts proximately causing Henderson's injuries.

3.     In the foregoing allegations, Henderson does not assert that all third parties whose bank accounts were involved in the scheme were, throughout their involvement, innocent or free from violating legal duties.

4.     Although it does not form the basis of any predicate acts in this action, the Enterprise also engaged in a Ponzi scheme that precipitated a securities fraud action by the SEC against those members of the Enterprise that participated in that scheme as well.[1] Ronald Throgmartin ("**Throgmartin**") is named as a defendant in that action, although he is not a named party in the companion Colorado receivership action commenced against Ray and other Enterprise members, nor is Throgmartin subject to any stay of litigation arising out of those actions. In the words of the SEC, "[w]ithout Throgmartin to keep him organized and communicate with investors, Ray could not have succeeded in running the Ponzi scheme." *Id.* (emphasis added).

5.     Throgmartin's role was also crucial in the check-kite scheme. Through interstate mails and wires, Throgmartin, acting directly on behalf of Ray and his business

---

[1] The SEC's Complaint is attached hereto as **Exhibit A**, and all its allegations are hereby expressly incorporated as if fully set forth herein pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

entities, purposefully provided false and misleading information destined for financial institutions  to open and operate new Enterprise accounts to conduct the check-kite scheme.

6.      Throgmartin, among other things, drafted invoices and emails reflecting non-existent cattle trades used at least sometimes in memo portions of checks to present an appearance of cattle brokering or other cattle transactions instead of check kiting and had online access to bank accounts in the names of Ray and at least some of Ray's business entities involved in the Enterprise, including but not necessarily limited to MR Cattle Production Services, LLC ("**MR Cattle**") and Custom Consulting and Product Services, LLC ("**Custom**").   Moreover, using both interstate telephone and email communications, Throgmartin personally communicated about an MR Cattle check of $729,679 payable to Kolterman known by the Enterprise to have been intended by Kolterman for deposit in Kolterman's account at Henderson and, on information and belief, facilitated a stop payment on such check to Kolterman at a time when Throgmartin knew (or was willfully blind in not knowing) that the check had already been deposited by Kolterman in the checking account of Kolterman and Kolterman's wife at Henderson (the "**Henderson Account**")  and used to support large payments from the same account by Kolterman back to the Enterprise.  Thus, on information and belief overt actions taken by Throgmartin (among others) in participation of the Enterprise's check-kite scheme are directly responsible for Henderson's injuries.

7.      Accordingly, Henderson now commences this civil action asserting claims against and seeking damages from Throgmartin pursuant to the Racketeer Influenced

and Corrupt Organizations Act (as amended, 18 U.S.C. §§ 1961-1968, hereinafter "**RICO**") and common-law theories of fraud and/or aiding and abetting fraud.

## Parties

8.      Plaintiff Henderson State Bank ("**Henderson**") is a bank chartered and organized under the laws of the state of Nebraska with its principal place of business in Henderson, Nebraska.  Henderson is an "insured depository institution" as defined in section 3(c)(2) of the Federal Deposit Insurance Act, and thus a "financial institution" as that term is defined 18 U.S.C. § 20.

9.      Defendant Ronald Throgmartin ("**Throgmartin**") is a resident of Buford, Georgia, approximately 55 years old.

10.      Throgmartin has held himself out as having financial expertise in the marijuana and cattle industries.  Throughout the time period described in this Complaint, Throgmartin served as general business consultant to Mark Ray and certain entities owned by Ray (*i.e.*, the Enterprise) and had certain attorney in fact powers for the Enterprise and, on information and belief, served as a de facto controller, including pertaining to the Enterprise's supposed cattle and marijuana operations.

## Jurisdiction and Venue

11.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 because it involves a question of federal law, as well as pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs, and is between citizens of different States.

12.      Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Throgmartin is subject to personal jurisdiction in this judicial

district under applicable law. 18 U.S.C. § 1965(b) provides that process may be served in "any judicial district of the United States" when required by the "ends of justice," and such provision confers personal jurisdiction over a defendant in any judicial district as long as the defendant has minimum contacts with the United States.  As detailed more fully below, Henderson is a Nebraska bank that was injured in Nebraska by the Enterprise's check kiting scheme.  Throgmartin, from his residence in Georgia (and/or other locations within the United States) conducted, participated in the conduct of and/or conspired to participate in that scheme through numerous overt actions, including acts purposefully directed at Kolterman and Henderson in Nebraska.  Exercise of personal jurisdiction over Throgmartin in this District comports with due process and notions of fair play and substantial justice.

## Factual Allegations

### Overview of a Fraudulent and Racketeering Enterprise

13.    The Enterprise at issue in this case consists of certain business entities, either individually or collectively, including two that are nominally or beneficially owned by Mark D. Ray ("**Ray**"), a 59-year-old resident of Colorado:

a.  Custom is a Colorado limited liability company with its principal place of business in Aurora, Colorado; and

b.  MR Cattle is a Colorado limited liability company with its principal place of business in Colorado.

Ray has held himself out as the sole member of Custom and of MR Cattle, including but not limited to stating such to Henderson.  Ray is a manager of Custom and of MR Cattle and has been since each was formed.

5

14.     Ray knew he desired to engage in a check kite with multiple Ray-owned entities and with third party bank accounts not owned by Ray.  Although MR Cattle and/or Custom actually owned a significant number of cattle and from time to time sold them, for many months Ray entities sent checks through banking channels that were not backed by sufficient cleared funds.

15.     Ray and Throgmartin controlled bank accounts in the name of Custom and MR Cattle which they used to send and receive money in furtherance of the Enterprise's fraudulent and racketeering activities, including the check kiting scheme.

16.     Discovery in this matter may establish that other entities nominally or beneficially owned by Ray and/or Reva Stachniw ("**Stachniw**"), a resident of Galesburg, Illinois, belong to the Enterprise engaged in the check kiting scheme, including those entities that Ray, Throgmartin and others used together with Custom and MR Cattle to conduct the Ponzi scheme:

    a.  RM Farm and Livestock, LLC, is an Illinois limited liability company with its principal place of business at Stachniw's residence in Galesburg, Illinois ("**RM Farm**");

    b.  Sunshine Enterprises is a business name used by Stachniw with a principal place of business at Stachniw's residence in Galesburg, Illinois ("**Sunshine**");

    c.  Universal Herbs, LLC, is a Colorado limited liability company with its principal place of business in Denver, Colorado ("**Universal Herbs**"). Universal Herbs is a marijuana business with two licensed retail locations in Denver, along with a separate licensed marijuana production facility. Throgmartin acts as financial advisor to Universal Herbs, which is owned by Ray according to financial

statements prepared for and sent to financial institutions by Throgmartin.  The assets of Universal Herbs were extensively commingled with the assets of Custom, MR Cattle and the other Ponzi Businesses.

    d.  DBC Limited, LLC is a Colorado limited liability company with its principal place of business in Aurora, Colorado ("**DBC Limited**" and, collectively with RM Farm, Sunshine and Universal Herbs, the "**Ponzi Businesses**").

17.    Custom, MR Cattle the Ponzi Businesses (with the exception of Universal Herbs and DBC Limited) routinely transferred large amounts of money back and forth among their bank accounts using checks and wire transfers.  [Ex. A, ¶ 53.]

18.    The vast majority of these transfers did not serve any legitimate business purpose or reflect any underlying economic realities.  [Ex. A, ¶ 54.]

19.    Rather, the Enterprise used the various entities and bank accounts to hide its activities and to give the illusion that it was engaged in actual cattle trading or profitably selling state-licensed marijuana.  [Ex. A, ¶ 55.]

20.    To conduct the Ponzi scheme, Ray (with the assistance of others, including Throgmartin) would have investors send money to accounts in the name of Custom, MR Cattle or one of the other Ponzi Businesses, with those investors' "returns" coming from accounts in the name a different entity.  Ray usually did not both receive and return a particular investor's funds from the same account.  [Ex. A, ¶ 56.]

21.    By using accounts in the names of different entities including some that gave the appearance of being unaffiliated third parties, Ray was able to evade detection by the fraud departments of the banks. In other words, it would have been more obvious to the banks that he was running a Ponzi scheme if all of his activities had run through

one account or through accounts only in his own name. At the height of the scheme, more than $140 million per month was being moved through accounts under the control of Ray, Throgmartin and/or Stachniw.  [Ex. A, ¶ 57.]

*The Check Kiting Scheme*

22.     A significant amount of cash coming into the Enterprise from new investors was not immediately paid out as supposed "returns" to old investors.  At any one time, the Enterprise had a significant cash balance in its possession or control, including cash spread across numerous accounts in the names of Custom, MR Cattle and the other Ponzi Businesses. (This allegation does not imply a significant true net working capital, as numerous unpaid check obligations also existed.) Cash from certain of these accounts was used to pay third parties who deposited it into accounts in their own names at their respective local banks.  Funds deposited in this manner was commingled in the third party accounts with other similar deposits from the Enterprise as well as with the third parties' own funds before being withdrawn by the third parties and sent back to the Enterprise.

23.     This flow of funds was part of the illusion created by the Enterprise to convince those outside the Enterprise, including Henderson and other financial institutions involved among others, that the Enterprise was engaged in actual cattle trading or profitably selling state-licensed marijuana.

24.     To explain this flow of funds, the third parties were held out by the Enterprise as providing legitimate services in connection with actual cattle trading or profitably selling state-licensed marijuana.

25.     At some point, one purpose of some of this flow of funds through third parties was to perpetuate the Ponzi scheme.  However, by no later than August, 2018,

and on information and belief starting in 2017, and lasting at least through March 2019, the Enterprise used this flow of funds to perpetuate a second fraudulent scheme that netted cash or access to cash for Ray and the Enterprise separate from the Ponzi scheme. This second scheme was a fraudulent check scheme, including check kiting. For simplicity, this second scheme is referred to herein as the "check kiting scheme." On information and belief, however, the fraudulent check scheme also included other bank fraud such as deposits of and interstate movement of cash that the Enterprise attempted, to avoid more rigorous reporting done by banks if a bank knows more than $10,000 in the aggregate in cash is deposited by a customer on a particular day and also representation to banks via financial statements that significant cattle and marijuana assets existed such that Ray held himself out as having a significant net worth when Ray's ownership of MR Cattle, Custom, Universal Herbs and other assets were considered.

26.     The check kiting scheme was carried out using variations on this pattern of funds flow between the Enterprise and its third party facilitators and also occasional purchasers of actual products or contracts, such as marijuana.

27.     First, funds would be paid from the Enterprise directly or indirectly (through one or more intermediaries) to a third party facilitator via check.

28.     At the time the check was written, the Enterprise knew there were insufficient funds on account to cover the check, or that there would be insufficient funds on account by the time the check was presented for payment by the depositing bank.

29.     The check was received by the third party and deposited into the third party's own account at its own bank.

30.     Once the funds became de facto available for withdrawal from the account, but before the deadline for the payor bank to pay the depositing bank, the third party would make a withdrawal and transfer the withdrawn funds directly or indirectly back to the Enterprise or to another third party facilitator whose checking account was in precarious and immediate need of funds due to that facilitator's writing checks to the Enterprise.

31.     Individuals, including but not limited to Ray and Throgmartin, also knew that bank wire transfers were involved with the check kiting scheme.  Although it was important that much money be transferred by checks due to check use rules being more relaxed than wire transfer use rules, sometimes wire transfers were used. The wire transfers not only added to the total volume of fund flow and number of transactions, making it more difficult for a financial institution at any one time to accurately gauge its actual available cash balance that had cleared banking channels, the wire transfers also moved money quicker than checks on occasions when such was needed to keep the check kiting scheme flying and/or to encourage banks to view the large volumes of funds flowing through Enterprise bank accounts as legitimate.

32.     On information and belief, one example of this wire transfer involvement was when, in September 2018, the Enterprise caused a $550,000 wire transfer to be sent from an Enterprise checking account to an account supposedly for the credit of RM Farm & Livestock related to a "final purchase and acquisition of RM Farm & Livestock" assets.

33.     Another example is incoming wire transfers to the Henderson Account from MR Cattle of $200,000 on Oct. 10, 2018 and $250,000 from Custom on Oct. 10, 2018.

34.     On information and belief, another example involves an individual who received, by interstate wire transfers, more than $4,000,000 and transmitted by wire transfer more than $2,000,000 in one month in 2018.  The transactions included but were not limited to the following:  incoming wires from Custom of $20,000 and $640,000 and outgoing wire to Kolterman of $650,000 all on Sept. 26, 2018; incoming wire from Custom of $850,000 on Oct. 4, 2018, and outgoing wire to Kolterman of $840,000 on Oct. 5, 2018; and incoming wire from Custom of $860,000 on Oct. 9, 2018, and outgoing wire to Kolterman of $850,000 on Oct. 10, 2018.  All these incoming wires to Kolterman went to the Henderson Account.

35.     At the time the check kite was grounded or stopped, the depositing bank would present the check for payment by the payor bank only to learn that such account was overdrawn and the check would not be honored.

36.     In turn, the third party often had insufficient funds in their account at the depositing bank to cover the bounced check and lacked access to capital sources (other than the Enterprise).

37.     Often, to enable its continued use of the third party facilitator to perpetuate its fraudulent schemes, the Enterprise would provide the third party with subsequent funds to pay to the depositing bank or take other actions so the third party could continue to keep active accounts at the depositing bank.  For example, Ray who was, on information and belief during the pertinent time frame counseled or otherwise aided by Throgmartin, encouraged third parties to agree to repayment plans with their depositing banks and then provided (or promised to provide) the third parties with funds to make one or more payments under that plan.  Ultimately, however, the depositing bank was repaid

little, if any, of the amount lost when the pertinent check bounced, and, on information and belief, some lost even more funds if they allowed the third party continued access to its accounts long enough for the process to repeat itself.

38.     Thus, at the expense of the depositing bank, the Enterprise gained funds that it used for its own purposes, including to perpetuate the check kiting scheme and the Ponzi scheme, and/or to cover personal obligations and fund the lifestyle of Ray and possibly others.

39.     The Enterprise repeated this process numerous times with multiple third parties.

40.     Each time it happened, those operating and controlling the Enterprise and causing it to carry out the check kiting scheme, including on information and belief Throgmartin, acted with the intent to defraud the depositing banks involved.

41.     Each time it happened, it was reasonably foreseeable to those operating and controlling the Enterprise, including Throgmartin, that the check kiting scheme would be carried out by one or more uses of interstate wires (including interstate communications and banking activity conducted via telephone calls, bank wire transfers and internet transactions) and, on information and belief, by bank fraud.

42.     In most, if not all instances, the process in fact did involve the use of interstate wires (including interstate communications and banking activity conducted via telephone calls, bank wire transfers and internet transactions).

43.     RM Farm transmitted to Kolterman a check.  The check was deposited into the Henderson Account, dated January 19, 2017, for $10,000. It was returned for nonsufficient funds.

44.     In a short time frame in August, 2017, beginning August 21, 2017, Kolterman deposited in the Henderson Account at least $69,500 in checks from Ray and RM Farm, all "even money" amounts.  He also deposited in the Henderson Account cash of $8500 on August 22, 2017.  A check ostensibly signed by Kolterman on the Henderson Account was returned due to insufficient funds in or around this time frame.  When the check was presented on the Henderson Account, it was payable to RM Farm and in the amount of $77,198.50 and had a memo reference "cattle."  On information and belief, someone other than Kolterman and Lynn Kolterman filled in at least the dollar amount, payee, and "cattle" reference on the check.  This $77,198.50 check eventually was paid by Henderson, on or about September 5, 2017.

45.     In September, 2017, Kolterman also received other checks from one or more Enterprise participants, including from Ray, that Kolterman deposited in his account at Henderson but were dishonored for nonsufficient funds by the pertinent payor bank.  On at least one occasion, Henderson's recollection is it was told funds would be wire transferred to Henderson to make up for the nonsufficient funds check amount, but such wire transfer never arrived in this time frame.

46.     In October, 2017, Kolterman also deposited a check from Ray into Kolterman's account at Henderson that was dishonored for nonsufficient funds by the payor bank.  Deposited simultaneously with this "NSF" Ray check was an even money Sunshine Enterprises check.  In October, 2017, Kolterman also deposited an even money RM Farm check on one day, and an even money Sunshine Enterprises check on the next day, with Kolterman's total deposits exceeding $76,000. In this same two-day sequence, there was presented on the Henderson Account through banking channels a $62,000

13

check payable to RM Farm that did not have sufficient funds to clear. Henderson was not at the time aware of a check kite, so the $62,000 check was paid. Another check for $5000 also was presented on the Henderson Account in this two-day sequence, payable to Stachniw. On information and belief, someone other than Kolterman and Lynn Kolterman filled in the payee on this $5000 check.

47.     Ray communicated with Kolterman numerous times during the check kiting scheme, including but not limited to calls and text messages Ray initiated. In the time frame of October 21, 2018, through November 1, 2018, for example, more than 70 calls occurred between the cell phone used by Ray as his primary cell phone and Kolterman's cell phone. On information and belief, most and perhaps substantially all of these calls involved Ray being located in one state of the United States (Colorado and perhaps also Indiana) and Kolterman in another state (Nebraska).

48.     Ray also communicated with Throgmartin numerous times during the check kiting scheme, sometimes via calls placed by Throgmartin and sometimes via calls placed by Ray.

49.     In the time frame of October 21, 2018, through November 1, 2018, for example, more than 110 calls occurred between the cell phone used by Ray as his primary cell phone and what Henderson's investigation indicates is a cell phone used by Throgmartin. On information and belief, most of these calls involved Ray being located in one state of the United States (Colorado) and Throgmartin in another state (Georgia).

50.      For another example, in the time frames of July 10, 2018, to August 9, 2018, and August 10, 2018, to September 9, 2018, there were approximately 106 and 333 calls, respectively, between the cell phone number of Ray and a cell phone number

14

of Throgmartin. Many of these calls indicate activity across state lines, with Ray's phone being used in Colorado and Throgmartin's in Georgia.

51.     Ray used an extraordinary telephone arrangement for more than 70 of the calls with Kolterman and more than 110 of the apparent calls with Throgmartin in the time frame of October 21, 2018, through November 1, 2018. He used a cell phone the Verizon account for which was in the name of Myron Stachniw, husband of Stachniw. Ray used the same cell phone for calls to and from Throgmartin's phone on numerous other occasions, such as but not necessarily limited to the time frame of July 10, 2018 through October 20, 2018.

52.     This extraordinary cell phone arrangement, which existed for many months, made it more difficult for anyone who would subpoena Verizon or perhaps send a Civil Investigative Demand to Verizon, without knowing Ray's cell phone number, to obtain the cell phone records, because those records in Verizon's account on information and belief showed the phone to be a phone of Myron Stachniw rather than Ray.

53.     The Enterprise repeatedly used Universal Herbs to advance Enterprise fraud. For instance, from time to time Ray or Ray's agents would state to banks involved with the check flow that Ray's ownership of Universal Herbs was valuable and lent financial support to Ray's non-marijuana transactions or business endeavors, including but not limited to significant cash available to Ray.

54.     One example of the foregoing is Ray's presentation to Henderson, through an agent after Henderson had suffered unpaid debts as a result of what became known later to be a check kite, that Ray had access to at least $25,000 per month from Universal Herbs that was available to help repay Henderson debts or loss. Ray also gave to

Henderson a balance sheet showing a supposed $21,000,000 asset value for Universal Herbs and another balance sheet showing a supposed $16,167,414 net equity in Universal Herbs. Ray (through an agent) emailed these balance sheets to Henderson in 2019.

55.     The Enterprise had ongoing participants, including but not necessarily limited to Ray, Throgmartin, Stachniw, MR Cattle, Custom, RM Farm, Sunshine (to the extent, if any, it was a business albeit a trade name of Stachniw), and Universal Herbs. Some of these participants were transmitting insufficient funds checks to Kolterman that were deposited into the Henderson Account. For example, in September 2017, RM Farm and Ray transmitted to Kolterman more than $58,000 in insufficient funds checks that were so deposited.

56.     The Enterprise's structure included without limitation:

A. Functioning of Universal Herbs, which actually did sell marijuana products from multiple locations in Colorado and which included physical buildings, inventory, one or more websites, and marijuana growing capabilities and generated cash (although by this allegation Henderson does not necessarily mean Universal Herbs was profitable or had net positive cash flow over the many months of the Enterprise). Universal Herbs owned marijuana flower inventory, concentrates and marijuana plants in production

B. Owning some actual cattle and some actual real estate rights to Oklahoma ranch/pasture land for locating cattle ("Ranch Land"). Ray had multiple entities or joint ventures involved with actual cattle, and on information and belief owned at least some part interests in actual cattle in his individual name. Ray mentioned

the Ranch Land to Kolterman and at least some other persons interested in potentially receiving checks and send checks to Enterprise participants.

C.  Allegedly improving at least some of the Ranch Land; and

 D.  Owning ranch equipment on or near the Ranch Land.

*Throgmartin's General Role in the Check Kiting Scheme*

57.    Throgmartin with the assistance of Ray and Stachniw, kept track of flow of funds among Custom, MR Cattle and the Ponzi Businesses [Ex. A, ¶ 62]. Throgmartin also kept track of at least some funds flowing between Custom, MR Cattle, and the Henderson Account and, on information and belief, funds flowing between Custom, MR Cattle, Ray, and others whose bank accounts and checks or wire transfers were involved with the check kiting scheme, including but not necessarily limited to certain funds flow to another Nebraskan other than Kolterman.

58.    Throgmartin also served as a primary drafter of some documents used in the various fraudulent racketeering scheme.  In furtherance of the check kiting scheme in particular, Throgmartin sent emails and/or text messages, invoices and on information and belief other documents to third parties with accounts at financial institutions.  [Ex. A, ¶ 63.]

59.    Throgmartin often instructed these third-party accountholders to which accounts they should send funds.  [Ex. A, ¶ 65.]

60.    Similarly, Throgmartin communicated on important occasions with various financial institutions at which Custom, MR Cattle or third parties held accounts.  In doing so, on information and belief:

A.   Throgmartin at least sometimes sought to allay concerns of those financial institutions about activity in those accounts, with the purpose and effect of facilitating and extending the life of check kiting scheme.

B.   Such communications contained oral and sometimes written statements which Throgmartin knew (or was reckless in not knowing) were false and would foster the detrimental reliance of the third parties and/or financial institutions directly or indirectly receiving those communications in subsequent or related funds transfers.

61.   For example, when the bank at which RM Farm had its accounts became concerned about the volume of transactions in the account, Throgmartin intervened and communicated frequently with the bank president to assuage his concerns.  As part of his effort to keep the account of RM Farm open, Throgmartin sent the bank president a false cattle inventory.  [Ex. A, ¶¶ 65-66.]

62.   Throgmartin has a long association with unsavory conduct by Ray. For instance, Joseph Bonar in May, 2009, sued Ray, an entity for which Ray was an insider named Berwick Black Cattle Company, and others.  Bonar alleged that Ray and others made false representations to Bonar, directly and through Throgmartin, "during the period of roughly late 2004 through September 2005" that funds Bonar sent to Ray entities were "being used to purchase cattle through cattle partnerships."  *Bonar v. Ray,* 2011 WLK 110467 (C.D. Ill. Mar. 22, 2011).  The U.S. District Court for the Central District of Illinois eventually, on October 19, 2012, entered judgment for millions of dollars in favor of Bonar.

63.     Ray in 2019 identified Throgmartin as a person having significant records concerning Enterprise cattle transactions, and Throgmartin during crucial times in the check kiting scheme had and used access online to MR Cattle and Custom checking account records.

64.     On information and belief, Throgmartin assisted Ray in providing information about alleged cattle values

65.     Meanwhile, Throgmartin was also significantly assisting Ray with Universal Herbs.  For instance, on information and belief Throgmartin not only gave Ray financial advice concerning Universal Herbs but also hired at least one consultant for Universal Herbs.

### *The Enterprise, with Throgmartin's Participation, Injures Henderson*

66.     Henderson was one of the financial institutions victimized and defrauded by the Enterprise's check kiting scheme.

67.     Specifically, the Enterprise, through Custom, MR Cattle and third parties knowingly or unknowingly involved in the check-kiting scheme, sent millions of dollars through the Henderson Account.

68.     Kolterman dealt with the Enterprise via checks and wire transfers extensively, receiving funds from and sending funds to the Enterprise.

69.     By October, 2018, the money flowing through the check kite and the Enterprise involved at least seven payees and more than five financial institutions. The payees included at least four that were not Ray or an entity for whom Ray appeared in a Secretary of State entity listing, thus giving a facial appearance of not being managed by Ray.   The frequency and number of checks and wire transfers into and out of the

Henderson Account made it difficult for Henderson to track and project cleared funds in the Henderson Account, and obfuscation or confusion of financial institutions was one reason Ray desired or approved of involving so many payees.

70.     As of October 26, 2018, Ray, MR Cattle, and Custom Consulting knew the Enterprise had overdrawn checking accounts at JPMorgan Chase Bank, N.A. ("**JPMC**"), by significantly more than $4,000,000.00; that hundreds of thousands of dollars of supposed funds of the Enterprise had been made payable to Kolterman; and that a check in the amount of $729,679.09 drawn by MR Cattle Production Services, LLC, dated October 24, 2018, (the "**MR Check**") had been deposited in the Henderson Account, and, on information and belief, that Henderson was relying on the MR Check clearing banking channels, that Henderson's conduct in reliance included but not was not limited to issuing a cashier's check dated October 26, 2018 (the "**Cashier's Check**"), and that by the time of issuance of the Cashier's Check, unknown to Henderson, one or more of extraordinary checks payable to Kolterman had been subjected to a stop payment request by one or more individual members of the Enterprise including Throgmartin.

71.     Henderson thought the Cashier's Check was supported by sufficient funds in the Henderson Account that had cleared by the time of its issuance.  But, due to conduct approved by Throgmartin and other legal persons associated with him, this was not true.

72.     The Cashier's Check was issued by Henderson payable to the order of a payee(s) specified in a vertical format with the name of Kolterman and his wife stacked on top of each in the payee area of the Cashier's Check.

73.     The Cashier's Check was in an amount of $1,442,882.53.

74.     Before October 26, 2018, Custom was, during August, September and October, 2018, on numerous occasions, receiving wire transfers and deposit items and sending wire transfers and/or writing checks in amounts and with timing that is not consistent with the fund flow being for actual cattle brokering, cattle fattening, or ranching business and are an indicator of fraud or similar unlawful conduct by the Enterprise.

75.     MR Cattle had at least one checking account with JPMC.  Throughout much of October, 2018, MR Cattle engaged in numerous wire transfer and check deposit and issuance transactions with affiliates of Ray, including but not limited to Custom.  MR Cattle fund flow includes writing checks in amounts and with timing that are not consistent with the fund flow being for actual cattle brokering, cattle fattening, or ranching business and are an indicator of fraud or similar unlawful conduct by the Enterprise.

76.     The Enterprise engaged in a check kite to defraud Henderson, perhaps along with other financial institutions.  Ray, with assistance from other members of the Enterprise, wrote checks on one or more JPMC accounts of the Enterprise without sufficient cleared funds existing in the accounts at the time the checks were written.  They also participated in a plan by Ray to transmit and receive pre-signed checks that were, on information and belief, blank as to dollar amount and in the memo line and were then completed by someone other than the individual signing the checks.  On information and belief, this was done, at least in part, because Ray knew one or more Enterprise accounts needed to have an ability to infuse uncleared funds rapidly and that waiting for the arrival of conventional checks would jeopardize the check kite.

77.     On information and belief, Throgmartin was a knowing and active participant in the check-kiting scheme generally and in the specific check-kite that injured Henderson

21

by, among other things, confirming or directing supposedly on MR Cattle's behalf a request to stop payment on the MR Check.

78.    In prior proceedings among other parties arising out of the check kite, Throgmartin's counsel has stated an intention to invoke or has invoked on behalf of Throgmartin the Fifth Amendment and thus refused to produce documents to Henderson. Throgmartin also sent at least one, and apparently a significant number, of supposed cattle inventory sheets used to allegedly justify a reason for incoming funds to the Enterprise during the check kite, as the Enterprise would purport to find cattle, describe them on an inventory, receive funds for the cattle, and then deposit those funds into one or more JPMC accounts.

79.    Throgmartin, among other conduct:

a.  Sent to Kolterman in Nebraska by email or text message a supposed invoice numbered 101118N, dated 10/11/18, due 10/11/18, for supposedly 479 cows priced at $997,467.47.  Kolterman paid the invoice from the Henderson Account.

b.  Created a template used for a supposed cattle invoice sent to Kolterman in Nebraska by email or text message, invoice numbered 101718.  On information and belief, this same template was used multiple times to send supposed cattle invoices to one or more facilitators of the check kiting scheme. (By "facilitators," Henderson does not in this Complaint take a position as to whether the recipients of the supposed cattle invoices or checks from the Enterprise were fraudsters or aiders and abettors of fraud or were victims or both.)

c.  Participated in phone calls with Ray in connection with cash needs of MR Cattle and Custom in connection with, among other transactions, checks the Enterprise

sent to Kolterman.  On information and belief during the time frame of October 21, 2018, through November 1, 2018, Ray and Throgmartin placed at least 118 calls to or from each other's phone numbers (with Ray's pertinent cell phone actually appearing in Verizon's phone records as owned by Myron Stachniw, husband of Stachniw).

d.  On information and belief, by the time of the Cashier's Check and the MR Cattle Check stop payment, had communicated multiple times via texts, phone calls, or emailing supposed cattle inventory sheets or invoices into Nebraska for Nebraskans to read and rely on.  These sheets or invoices were sent to a Nebraska citizen involved in the check flow used fraudulently by the Enterprise for check kiting.

e.  Assisted Ray in compiling or otherwise providing information for and reviewing balance sheets used by Ray in convincing one or more banks to conduct business with Ray.  One or more of these banks were being damaged by the check kiting scheme.

80.      On information and belief, discovery will provide further proof such as:

a.   Throgmartin participated in preparing at least some of the aforesaid inventory sheets or invoices or the computer-stored form used to prepare them.

b.   Throgmartin directly communicated with JPMC to confirm or place a stop payment request on the MR Cattle Check, knowing or acting at the time that Ray was involved in writing and delivering checks on insufficient funds, including the MR Cattle Check. This included communication by Throgmartin via means considered to be "wire" communications under a federal wire fraud statute.

c.  There is a danger the Enterprise might resurface.  For instance, even after the Henderson Account ceased active use and Henderson discovering insufficient funds activity, in 2019 Custom received a wire transfer of $100,000 sent Jan. 23, 2019, from someone and wire transferred back $188,000 to the sender's account received by the sender Jan. 29, 2019, and meanwhile, the sender had a negative balance in his checking account of approximately $184,031.33 on Jan. 22, 2019. Ray and Kolterman communicated about this same sender in October 2018 when concerned about insufficient funds in at least one and potentially multiple Enterprise checking accounts. Henderson does not hereby allege the Enterprise has ceased, although it may well have ceased or transformed.

d.  Throgmartin communicated with an outside accountant for Ray and Ray's entities in connection with information used by Ray in multiple supposed consolidated balance sheets.  These balance sheets were significant in Ray's ability to convince one or more banks to allow Ray to conduct business directly or indirectly with them.

81.    Without Throgmartin's conduct, the check kite would not have lasted as long as it did and/or Henderson would have pursued Ray more quickly for a remedy to Henderson's damages, and thus Throgmartin's conduct contributed to Henderson's damages.  Moreover, by facilitating participation of parties in Nebraska who were not relatives of or entities owned or directed by Ray, Throgmartin's conduct made the check kite harder to discover and also made it harder to trace funds equitably belonging to any particular victim, such as Henderson.

82.     On information and belief, Henderson alleges: Stachniw is allegedly liable for certain Enterprise fraud that damaged Henderson as a participant, civil conspirator or aider and abettor.  Knowing of Stachniw's potential liability to banks, Throgmartin on information and belief contracted with Stachniw to receive more than $425,000 from Stachniw in late 2018, which, while allegedly in return for an interest in favor of Stachniw in a limited liability company that would acquire assets, resulted in depletion of cash available to creditors of Stachniw and also made it more difficult for creditors to realize on Stachniw's supposed asset, which was a limited liability company with a prohibition on transfer of anything other than an economic interest unless all members agreed with the membership transfer.

## COUNT I

## RICO § 1962(c)

83.     All allegations of this Complaint are incorporated herein by this reference.

84.     The Enterprise is an enterprise engaged in and whose activities affect interstate commerce. Without limiting the generality of the foregoing sentence, during the pertinent time frame, the Enterprise engaged in interstate commerce via interstate sales of interests in cattle, receipt and transmittal of the aforesaid cashier's check from Nebraska to Colorado, and wire transfers initiated in Colorado and going to an individual located in a different state and going to Kolterman in Nebraska via deposit into the Henderson Account.

85.     Throgmartin is associated with the Enterprise.

86.     Throgmartin agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Henderson.

87.     Pursuant to and in furtherance of their fraudulent scheme, Throgmartin committed multiple related acts of wire fraud and bank fraud.

88.     The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).  For instance, see conduct described in Paragraphs 50-51, 63 and/or 67 hereinabove.

89.     Throgmartin directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

90.     On information and belief, as a direct and proximate result of Throgmartin's racketeering activities and violations of 18 U.S.C. § 1962(c), Henderson has been injured in its business and/or property.  For instance, Henderson, in its handling of the Henderson Account, ended up issuing the Cashier's Check and incurring a loss when the Cashier's Check was deposited into a Custom account and an alleged holder presented the Cashier's Check to Henderson for payment and checks used to fund the Cashier's Check were subjected to stop payment; and the stopping of payment on checks deposited into the Henderson Account left the Henderson Account with a negative balance owed to Henderson; and Henderson incurred tens of thousands of dollars of legal expense, inspection expense and officer time investigating the Enterprise and damages to Henderson.

WHEREFORE, Henderson requests that this Court enter judgment against Throgmartin and in favor of Henderson for Henderson's damages in an amount to be determined by the Court (if at trial by a jury of this Court); treble damages pursuant to 18 U.S.C. §1964(c); attorney fees and other legal expense pursuant to 18 U.S.C. §1964(c); court costs; and, to the maximum extent allowed by law, prejudgment and post-judgment interest; and such other relief as is just.

## COUNT II

## RICO § 1962(d)

91.     The allegations of all foregoing Paragraphs of this Complaint are incorporated herein by this reference.

92.     As set forth above, Throgmartin agreed and conspired with others, including but not necessarily limited to Ray, MR Cattle, Custom, Universal Herbs, Sunshine and RM Farm to violate 18 U.S.C. § 1962(c).

93.     For instance: Throgmartin agreed to advise and assist, and provided major time and services in advising and assisting, Ray and undertook tasks for Ray that included record-keeping, record-creating, checking account monitoring and attorney in fact functioning.   On information and belief Throgmartin also assisted Ray in circulating or preparing one or more balance sheets given to financial institutions and in or finding an accountant to help compile or to lend the accountant's name to one or more balance sheets of Ray, including one given to Henderson.   The balance sheets supposedly included the effect of assets and liabilities of entities such as MR Cattle, Custom and Universal Herbs.

27

94.     Throgmartin has intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Throgmartin knew that his predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further schemes described above.  That conduct constitutes a conspiracy to violate 18 § 1962 (c), in violation of 18 U.S.C. § 1962(d).

95.     On information and belief, as a direct and proximate result of Throgmartin's racketeering activities and violations of 18 U.S.C. § 1962(c), Henderson has been injured in its business and/or property.  For instance, Henderson, in its handling of the Henderson Account, ended up issuing the Cashier's Check and incurring a loss when the Cashier's Check was deposited into a Custom account and an alleged holder presented the Cashier's Check to Henderson for payment and checks used to fund the Cashier's Check were subjected to stop payment; and the stopping of payment on checks deposited into the Henderson Account left the Henderson Account with a negative balance owed to Henderson; and Henderson incurred tens of thousands of dollars of legal expense, inspection expense and officer time investigating the Enterprise and damages to Henderson.

WHEREFORE, Henderson requests that this Court enter judgment against Throgmartin and in favor of Henderson for Henderson's damages in an amount to be determined by the Court (if at trial by a jury of this Court); treble damages pursuant to 18 U.S.C. §1964(c); attorney fees and other legal expense pursuant to 18 U.S.C. §1964(c); court costs; and, to the maximum extent allowed by law, prejudgment and post-judgment interest; and such other relief as is just.

## COUNT III

### Direct participation in or aiding and abetting common law fraud

96.     All of the foregoing allegations of this Complaint are incorporated herein by this reference.

97.     Throgmartin aided and abetted the Enterprise (perhaps with others) in defrauding Henderson.

98.     Throgmartin substantially encouraged the Enterprise to continue a check kite, to the detriment of Henderson.

99.     Throgmartin, at a time in his participation in or aiding and abetting the fraud, knew that the Enterprise was involved in unlawful conduct.  Ray knew and Ray was a manager and member of Universal Herbs, RM Farm, Custom and MR Cattle.

100.    The check kite and/or related fraud aided by Throgmartin substantially damaged, directly, proximately and naturally Henderson. Henderson's damages exceed $1,000,000 by Henderson's calculations and are increasing.

101.    Henderson's damages include but are not limited to Henderson's attorney fees and other legal expense of dealing with third parties whose conduct has required Henderson to retain legal counsel and incur legal expense and whose conduct arises out of or due to fraud described in this Complaint.  For example, Henderson incurred attorney fees of dealing with Kolterman after Kolterman's default in obligations owed to Henderson. A default arose, for example, after Kolterman deposited one or more checks in the Henderson Account in connection with communications aided or undertaken by Throgmartin.  One such check was the MR Cattle Check.

102.    Henderson's damages also include those resulting from a negative balance in the Henderson Account, of which damages Throgmartin was direct and proximate cause.

WHEREFORE, Henderson respectfully requests entry of a judgment against Throgmartin and in favor of Henderson for Henderson's damages (including but not necessarily limited to an amount equal to the overdrawn amounts on the Henderson Account, Henderson's attorney fees of dealing with the Henderson Account and related defaulted obligations after Kolterman's default in obligations owed to Henderson, and Henderson's attorney fees of dealing with one or more persons involved in the fund flow and handling of the Cashier's Check), prejudgment and postjudgment interest to the extent allowed by law, Henderson's reasonable attorney fees and other legal expense to the extent allowed by 18 U.S.C. Section 1964(c) and any other applicable law, treble damages to the extent allowed by 18 U.S.C. Section 1964(c), and Henderson's accrued and accruing costs.

HENDERSON STATE BANK, Plaintiff

By:   /s/ Thomas O. Ashby
      Thomas O. Ashby (NE# 17610)
of    BAIRD HOLM LLP
      1700 Farnam Street
      Suite 1500
      Omaha, NE  68102-2068
      Phone: 402-344-0500
      tashby@bairdholm.com
      Its attorneys